Argued and submitted May 30, 2001, affirmed November 27, 2002

In the Matter of
Ryan D. Smith, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF JACKSON COUNTY,
*Respondent,*

*v.*

RYAN D. SMITH,
*Appellant.*

98-0325-JA; A106007

58 P3d 823

Robert Rosenthal, New York, New York, argued the cause for appellant *pro hac vice*. With him on the briefs were Christine Brinton, Certified Law Student, and Robert C. Van Siclen, Auburn, Washington, and Roger K. Evans and O'Neil, Evans, Swogger & Cowan.

Mary Williams, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Ann Kelley, Assistant Attorney General.

Lisa Short and Snedeker, Smith & Short filed the brief *amicus curiae* for Scientists Concerned for Reliability of Children's Reports, Accusations, and Testimony.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

### KISTLER, J.

The state alleged that youth had committed 21 acts that, if he were an adult, would constitute coercion, menacing, sexual abuse, rape, and sodomy. The trial court found that youth was within its jurisdiction based on 12 of the acts but that the state had failed to prove the remaining nine acts. Youth appeals. We affirm.

Since 1995, two families have lived next to youth and his family in Ashland. The Helveys moved in in February 1995. Youth was 10; the Helveys' son was five and their daughter was "[t]wo going on three." Ms. Helvey explained that youth's behavior became "extremely invasive" in the few months that they lived next door. She testified that youth "spied on us a lot." "He sat upstairs in his house and looked in the windows of our house. We found him underneath the window from our bedroom." One time, youth got inside the Helveys' home even though it was locked. Another time, Ms. Helvey stopped youth as he was leading her two-year-old daughter over into his yard. She decided that things were "getting out of hand" when she found that youth had tied her five-year-old son to a chair and left him sitting on the side of the house. The Helveys moved away in June.[1]

The Linsdays moved in the same month that the Helveys left. The Linsdays have 11 children. Ten are adopted; eight are special needs children. Many of the Linsdays' children had few friends other than youth, and youth came over to the Linsdays' house frequently. During that time, the Linsdays had some concern that youth was acting inappropriately. They were concerned that he would put the children on his lap in the swing. "[S]ometimes [they] felt that he was just playing too roughly and not being careful enough, and we would talk to him about that. He was talked

---

[1] The Helveys' experience was not unique. Some time before the Helveys moved in, another neighbor stopped her children from playing with youth. She explained that youth "used to do certain things that I didn't really like my kids to do, you know, like jumping off the roof [of a shed] or running in the street when cars were coming." "[O]ne time he tried to—I guess he tried to get a skunk out from underneath [the neighbor's] shop, and he was going to start a fire, and my three-year-old came and gave me the matches and told me that's what [youth] was doing." After that, that neighbor's children stopped playing with youth.

to a lot of times about that." The Linsdays, however, allowed youth to come over to play with their children in their yard and allowed their children, with some restrictions, to go over and play in youth's yard. At youth's house, many of the activities focused on a pigeon coop that youth maintained with the help of "T," a man who had taken an interest in youth.[2]

On Tuesday, April 14, 1998, one of the Linsdays' children, C, told his mother that he needed to talk with her. When his mother asked what he needed, he said, "Oh, nothing." The same conversation took place the next day. On Thursday, C once again told his parents that he had something important to tell them and began acting increasingly upset. His parents said that, if he could not share the information with them, he needed to take a quiet time in his room. After 30 minutes, C came out and said, "Mommy, I need to talk to you." When his mother asked if he wanted to talk to both her and his father, he said, "I'll just tell you right now, and you can tell Daddy." C's mother took him where he could speak with her privately, and C told her that "some things had happened with [youth] in the pigeon coop that were inappropriate."

When C was talking to his mother, he had his head down and "[h]e was just pounding his hands down[.]" He kept saying: "And I need to—I need to tell you this and it's—and it's not easy, and you're not going to be happy. And I don't want to get [youth] in trouble. I don't want to get [youth] in trouble." C was crying, and his mother was trying to calm him down. Although she was "hoping against hope" that C was just going to tell her about something minor, she soon learned that "it was something sexual and that it was—that it was going to be a big problem." As C spoke, his mother learned "several details about what happened and about some threats and about some threats of physical violence."

C's parents did not say anything to the other children that night. On Friday, the police arrested youth, and the Linsdays took C to see his therapist. Ms. Linsday explained

---

[2] T met youth approximately five years before trial. When they first met, T was working as a waiter in his family's restaurant. T gave youth a pair of pheasants. Later, both T and youth were involved in a pigeon club, and T spent time with youth at the pigeon coop.

that "[t]he story that we gave the children that day and that weekend was that some inappropriate things had happened with [youth] and [C] and that [youth] had to go to a special place to talk about these things." On Monday, after C learned that youth was not coming back, he told his mother other things that youth had done. On Monday, he told his parents that he thought youth had done "some yucky things with the little kids." Ms. Linsday spoke individually with the other children, all of whom disclosed that youth had sexually molested them.

At trial, the court heard testimony from Ms. Linsday, from the children, and also from the various medical professionals and officers who spoke with the children. Youth and his family testified. Youth also called an expert witness who criticized the way that the case had been investigated. After considering that evidence, the trial court found that the state had not proved its case regarding one of the Linsdays' children and one of the Helveys' children. It found, however, that the state had proved beyond a reasonable doubt that youth had abused seven of the Linsdays' children. Because youth argues on *de novo* review that the state failed to prove any of the allegations, we summarize the evidence concerning those seven children. As the trial court did in its findings, we start with C and then turn to A, Z, V, E, S, and G.

C was 12 years old when he told his mother that youth had sexually abused him. The Linsdays adopted C when he was seven. Before being adopted, he had lived with two foster families for much of his life. He has severe diabetes and, because of his biological mother's actions when he was an infant, had "a lot of abandonment issues." When he first came to the Linsdays, C had difficulty following directions and managing his anger. He acted out and was aggressive with the other children. From 1993 through 1997, C went through substantial therapy. He was hospitalized in 1996 and 1997 for intestinal blockages and also for psychiatric problems. His therapist testified that C's behavior changed markedly when he was discharged from the hospital in 1997. She explained that, when he came home, he was "very different. He was probably one of our—he was—he was a model student." At that point, his therapist questioned whether he belonged in a program for troubled students but concluded

that it was appropriate for him to remain in the program while he made the transition back into public school.[3]

In February 1998, C began going over to youth's house to play with him. Youth was 13, and the two boys spent time together in youth's pigeon coop. As noted, on Thursday, April 16, 1998, C told his mother that youth had threatened and sexually abused him over the past few days. The next day, he spoke with two detectives and told them about three days that week when he went over to youth's pigeon coop. C said that, on Tuesday, youth was not acting like himself. He started talking about his girlfriends nonstop, saying he wanted to sleep with them, and showing C pictures from his wallet that C did not want to see.

On Wednesday, the same thing happened. Youth began talking about his girlfriends and saying that he wanted to sleep with C's sisters. He asked C if he wanted to see youth's penis. Youth then asked about seeing C's penis. C did not feel comfortable and tried to leave. Youth, whom C described as a big person, grabbed C from behind. C told youth that he wanted to go home, and then he said that youth's mother might be watching, but youth said no. Youth held C tight and was rubbing against him. Youth threatened to hurt C with a power drill, and C said that "he wanted me to show it to him and— I was just really scared, I did show it to him."

C said that, on Thursday, youth threatened him and "made [him] swear not to tell." That day, he touched C's penis on the outside of his pants. He asked C to reciprocate but C refused.[4]

In late June, C told his mother that some things were bothering him and that he needed to talk with her. She called the officers, who spoke with C again. C told the officers that youth "has been doing this kind of stuff since a few months ago, more than five months ago." He admitted that,

---

[3] After C came home in 1997, he began to talk to his mother and to his therapist about his foster mothers. He said that they had disciplined him and that one of his foster mothers had inserted some sort of "plastic toothpick" in his penis when he was little.

[4] C spoke with the officers a second time three days later but did not add anything significant.

when he spoke with the officers in April, that was not the first time that this sort of thing had happened. C described a series of incidents in which youth approached him, rubbed against him, apologized for doing that when C asked him what he was doing, but continued sporadically over a period of a few months to touch C sexually.

At trial, C's testimony generally corresponded with his statements to the officers, although there were some differences. C testified, consistently with his statements to the officers in July, that youth would touch his bottom with his hand and say it was an accident, although C did not believe that it was. When asked why he doubted youth, C replied: "Because I think that once may be an accident, but just if it happens a couple of times, it's not." C testified that once youth had threatened him with a power drill, as he had told the officers. He also testified that, when youth was holding him from behind, his pants were down and so were youth's. He said that youth had touched his bottom with his penis on two different occasions. C said that he was trying to get away but that youth threatened that he would harm C's family. C explained that he had tried to tell his mother and that he finally did so because, "I wanted to get it off my chest, and my mom knew there was something wrong with me."

A was 10 years old when these events occurred. After C spoke with his mother, Ms. Linsday asked A whether youth had hurt her. A initially told her mother that youth was sometimes mean and that he pinched her and poked her. The next day, she said that youth had put his penis in her bottom and in her vagina and that he had also done the same thing to V.

On April 22, 1998, A spoke with her physician, who took verbatim notes of their conversation. In response to open-ended questions, A explained that she and V had gotten hurt, that their next door neighbor "did something that was really bad," and that "[h]e put his private parts in our private parts." She told the doctor that it hurt a lot. When asked whether it bled, she initially said "no" but then said, "Wait. Only a little." When asked whether something came out of youth's private part, she said, "[W]hite stuff. I don't know what it is called." She told the doctor that the same thing had

happened on three different days. She said that she had not talked to any of her brothers and sisters about this.

Two days later, A spoke to the police. The detective who interviewed A asked her leading questions. Despite those questions, A told the officers substantially the same thing that she had told the doctor. She said that youth had abused her and V on three different days and that Z had been there on one of the days.

After her first interview, A continued to make disclosures to her mother, and the detectives interviewed her a second time. As the trial court observed, "[A's] story over time, particularly in the second video[taped interview with the police officers], does grow increasingly bizarre in regards to what is shared with her by [youth.]" During the second interview, A described photographs of youth's father, mother, and sister clothed on a trip to Mexico. She began to describe photographs of youth doing sexual things with young children and animals. By the end of the interview, she was describing pictures of youth's family unclothed and engaged in sexual acts.

At trial, A's testimony mirrored her statements to her mother, her physician, and the officers. She initially described, as she had to her mother and her doctor, the incidents in which youth sexually penetrated her and then V. She also described on cross-examination a series of photographs and acts that not only mirrored but went beyond what she had told the officers in the second interview.

When Z was nine, he played with youth in the Linsdays' yard but did not go over to youth's house. At trial, he testified that one day C hit him with a ball by accident and that all of the other children went inside. He said that "[youth] came over and picked me up and then pulled down his pants and pulled down mine and then put his penis in my bottom." Z consistently described the same incident to his mother, to the doctor, and to the officers. When the doctor asked him how that felt, he told her, "It felt bad. I was crying." He said that youth kept "poking" his penis into his bottom. Z initially testified that he had not seen youth's penis. Later, he testified that he had seen "[w]hite stuff" come out of youth's penis "[w]hen he put his penis in my bottom."

Z also reported other incidents. He said that youth had exposed himself while walking to school one day and that youth had tried to put a rock up Z's bottom once.[5] According to Z, "he was trying to, but it wouldn't work," and it felt bad. Z also reported that he had seen youth try to do various things to his brothers and sisters. Z said he had been there when youth had pulled his own pants and V's pants down and rubbed against her, and that he had done the same thing to A. Z also reported that youth had pulled G's pants down on the swing.

V was nine. She has cerebral palsy, substantial hearing loss, and is developmentally delayed. Her pediatrician explained that the way that she processes information may sometimes cause her to give inappropriate responses to questions. Her first answer to a question is often "no," but if she has a few seconds to think, "then she would expand on the question and the answer, and then give you a full answer."

Ms. Linsday explained that, when V came home from school one day, she heard her crying in the bedroom. She had rarely heard V crying and went to investigate. She found V "back behind her bed, and I've never seen her there." Her mother asked, "Honey, what happened?" and V said, "[Youth]." Her mother picked her up and said, "Sweetie, you can talk to me. What's wrong?" V was crying and told her mother that youth "had put his penis in her." She said that he had put his penis in her bottom and in her vagina and that he had hurt her head.

V spoke with the detectives twice. Her conversations with them were consistent with what she told her mother but only after the detectives asked leading questions. On that point, even youth's expert agreed that, because of V's limitations, it would be difficult to interview her without asking leading questions. A pediatrician also examined V. V told the pediatrician that "[youth] next door" had hurt her but initially said that he had hurt her bottom by spanking it. When asked if youth had touched her vagina, she said no.

---

[5] Ms. Linsday testified that Z told her that youth had tried to put a rock up Z's penis. Z, however, told the officers, the doctor, and the court that youth tried to put a rock up his bottom.

After speaking with V, the pediatrician did a physical examination. Her examination revealed that the posterior aspect of V's hymen was very thin. In the doctor's opinion, the thinning was "evidence of penetration of her hymen with an object that is large enough to cause stretching of the hymen." The pediatrician testified that something "had penetrated through her hymen more than once to cause the thinning" that she saw. After the examination, the pediatrician talked with V about what she had seen. She told V that she "could tell that someone had touched her tee tee," and V nodded her head "yes." When she asked who had done that, V "replied without any hesitation, quote, '[youth] did.'" And when the doctor asked what he had touched her vagina with, V said, "He poked it with his penis, he pokes it with his penis." She told the doctor that it hurt when he did it.

E was eight years old and developmentally delayed. He told his mother that youth would tell him, "Close your eyes and open your mouth; I've got a big surprise." If E wouldn't open his mouth, youth would pinch his cheeks. E said that youth would put his penis in his mouth and would "pee" in and around his mouth. E explained that youth called him names and said that he would hurt E if he told. E reported the same incident to the officers and his physician, and he testified to that incident at trial.[6] At trial, E also testified that youth had touched his penis on the outside of his clothes. E reported the same incident to the officers and to his physician. Ms. Linsday testified that E told her that youth had touched his body, but she was not more specific than that.[7]

S was "quite delayed" when the Linsdays adopted him, and he had anger problems when he was three or four. He was eight when these events occurred and, by that time, had become "very social" and "sought after as a playmate." Unlike some of his brothers and sisters, he had developed friends other than his family and youth. He was the last child to talk to his mother about youth. One day, when he came

[6] E testified that Z and C were present when youth put his penis in E's mouth. E's testimony is consistent with what Z told the officers.

[7] Ms. Linsday testified that E "talked about [youth] touching his body, but primarily what I was told was [youth] putting his penis in his mouth[.]"

home from school, he was angry and knocking things off the counter. "He kept saying, 'I'm not going to talk about [youth]?'" His mother said, "Okay. You don't want to talk about [youth]." S, however, kicked something, and his mother asked him to sit down. He asked whether youth was going to come home that day. When his mother said that she did not believe that he would, S told her, "'Then I need to tell you something,' and he said, 'It's a secret, I promised not to tell.'"

After his mother talked to him about promises, S told her that he had been in the bathroom in his school and that youth had come in after he did.[8] He said that youth had told him to pull his pants down and that he had. Another boy came into the bathroom, and S pulled his pants up.[9] The other boy left, and S told his mother that youth "put him against the wall and made him put his hands on the wall and that he pushed his penis in [S's] bottom. And [S] said that it really stung and he told [youth] not to do it, but [youth] kept doing it." When youth finished, he told S that he had to promise not to tell.

S told his mother that the same thing had happened a second time when youth was at his school. The second time, S said, youth pushed him against a heater. While S was telling his mother what had happened, "[h]is voice was very quiet, and it kept cracking, and he acted very ashamed. He kept saying, asking me if I still loved him," and his mother reassured him that she did. S consistently recounted the same two events to the officers, to his physician, and at trial.

G had been exposed to drugs before birth. Ms. Linsday described him as a high-energy child who was very active. He was seven when these events occurred. At trial, G testified, "[Youth] was trying to put his penis in my mouth, but I kept

---

[8] Youth goes to a different school, but youth's mother works at the school that S attends. Youth testified that, because of his mother, he is often at S's school.

[9] S also testified at trial that he was pulling his pants up when the other boy came into the bathroom, although the sequence of events was different. However, when S spoke with the officers, he told them that the boy came in while youth was sodomizing him. The officers were able to identify the eight-year-old boy who came into the bathroom. One of the officers asked that boy "if he remembered going in the bathroom and seeing anything happening." The boy said that he did not remember.

it closed all the time." He told the court that it happened on the patio. He said that "pee-pee" came out of youth's penis, but it was white. G had reported the same incident to his mother, to the police officers, and to his physician. He also testified at trial that youth would try to pull down his pants when they were in the backyard. That testimony was consistent with what he told his mother and the officers and also with what Z had reported seeing.[10] Finally, at trial, G testified that youth had "touched [his] winky just like once." Youth "like just tried to pull—he was pulling it." According to G, "[youth] was like trying to like pull it off, but it was on really good[.]"[11]

After considering the evidence presented over eight days of trial, the court found:

> "These are difficult matters. I don't know that this is the most difficult case I've ever had, but when I retire and people ask me about what was the most difficult case I've had, I will certainly remember this one.
>
> "I think it's fair to characterize the Defense version of this case as follows. This is paraphrasing, this is simplifying an otherwise very complicated matter. But I think the Defense version is that [C], for whatever motivative reasons, told his parents back in April of 1998 a lie.
>
> "That his parents, Shell[e]y Linsday in particular, for whatever motivational reasons, took that lie and expounded upon it, not just with [C] but with all of her other children, until it reached the level that we've been dealing with for these last—this last week and a half. To a certain degree, Shell[e]y Linsday has been on trial in this case. There was no way to get around that.
>
> "Dr. Bolstad [youth's expert witness] is a very impressive witness. He's a very intelligent man with very good experience. And he provides a lot of good advice and clues to

---

[10] Z had told the officers that youth made G sit in his lap in the swing and would try to pull down G's pants while they were swinging. G had told his mother that youth would hold him on the swing and wiggle against him. Finally, he told the officers youth would pull G's pants down, and he would keep pulling them up. When the officers asked him if that happened on the swing, he agreed.

[11] Neither Ms. Linsday nor G's physician testified that G had told them of this incident, and he did not mention it to the officers when he spoke with them.

the Court and to anyone else who might be involved in this sort of business. But this is not a laboratory.

"Would it have been better—would this case have been better prepared and presented if these children had gone to professionals such as Dr. Bolstad from the very beginning? Probably. But they didn't. And I can't make my decision today based on what they might have done or said had they done so.

"Rather, it's to be based on what I've been hearing, seeing and observing for the last eight days. In trying to determine whether [Shell[e]y] Linsday would encourage [C] or any of her other children to embellish or add to their stories in order to get [youth] for whatever reason, I take into consideration her own demeanor as she's testified and as she's been in Court.

"And what I see is a person who I—I've been told that I've got a pretty good recollection, I've got a good memory. I'm losing it as I get older, I'm finding, but I'm quite impressed with Ms. Linsday's ability to remember things, particularly given the size of her family and the number of issues that that family has to deal with.

"Ms. Heckert asked the Court to ask itself, and I have been doing so for eight days, what possible motivation would Ms. Linsday have to encourage her children to make up stories about [youth]. I'm still waiting for an answer to that question.

"Counsel argues for the Defense that these children, the dynamics of this home, requires that each of them demand attention. I suppose that's true to a certain extent in every home. But to make the leap that these children would make up these stories for the sole purpose of gaining attention within their own home is making an assumption which is not based on anything that's in the evidence.

"To the contrary, the Court is impressed with Ms. Linsday and Mr. Linsday's ability to deal with these children and their various issues and the way that they are progressing as people from the time that they were first brought into the Linsday home. They are not to be attacked for that, they are to be commended for that.

"Was there, were there some implausible stories in here? Were there some bizarre statements? There's no question about it, there were. Does this Court ever hear

implausible and bizarre stories? I wish the answer to that question would be no, unfortunately, I do. I think the public would be very surprised if they spent a great deal of time in this Court or any other Court in this county or any other Court in this state to hear of what people do to one another. Things that most of us would never believe could be done, but unfortunately do happen every day.

"Does that mean that I automatically accept when bizarre behavior is testified to by a child? Well, it happens all the time, therefore I must accept it? Of course not. Was I troubled by some of the evidence presented here, particularly candidly by [A] and [Z] about these photographs that never showed up? Sure I was, and I remain so.

"Did they ever exist? I don't know. Did they exist and were removed before the warrant was executed? I don't know. Were they exaggerated upon by children who are not used to seeing anything along the lines of what we refer to as pornography? Were the exhibits that we did see in evidence shared with them and they embellished that to include the kinds of rather bizarre photographs that they said would be there? I don't know that either.

"Do those statements cause the Court to question whether the initial consistent statements that they made to their mother, to their doctor, to the police and to this Court are false? No, it does not.

"Neither counsel made too much of a point, and I don't want to make too much of a point of it either, but I can't let it pass completely. And that is this, in regards to photographs and other allegations of sexual acts, I find it unusual that a 13-year[-]old boy would have in his room the kinds of things that [youth] had in his room when the warrant was executed. It certainly, at the very least, shows a great interest in sexual matters, and to that extent, does corroborate that he has an interest in sexual matters, which the Court cannot find would be unusual to express to his playmates.

"I'm going to go through each count one by one. It would frankly be easier for me to start with the easiest ones for me and work my way out, but I'm not going to do it that way, primarily because staff would not be very happy with me. So I'll start with Count 1, which is Coercion, which nobody argued actually, and which I've been pondering for a period of time and have determined for myself that this is not the

kind of activity, even if proven, that the statute that charges coercion was intended to address.

"Basically, what it is accusing [youth] of is threatening [C] with harm if [C] didn't allow the crime to occur. If you carry that logic out, you could make the argument that coercion could apply to just about any kind of a crime where a threat is involved, and yet many crimes include threats as part of the elements. Robbery, kidnaping and so forth. I think coercion is intended to get at actions somewhat different than what was alleged here and proven here. And for that reason, the Court declines to take jurisdiction on Count 1 and finds [youth] not guilty.

"Counts 2 and 4 both accuse [youth] of Sexual Abuse in the Third Degree. [C] obviously showed reluctance in talking about this matter. He showed reluctance in talking about it to his parents. The point was made that he was sent to his room and would not be rewarded with being released from his room until he said something and this was what came out.

"Other evidence was that [youth] has been—or [C] has been sent to his room a thousand times for not communicating whatever it was that needed to be communicated. That there was nothing unique about this particular matter, except that for a day or two prior to that it was apparent to his parents that [C] had something on his mind that he wanted to get off his chest and just could not or would not.

"That was the best method that they had learned in which to help him to open up and to communicate. That in and of itself does not tell me that he went to his room and then conjured up the story that we heard today. Now, it's— or this week. It was also pointed out that what he told his mother on the 16th was not necessarily what was told to the officers the next day, and in fact didn't come out in the same form until the third video.

"I find that [C] was reluctant to talk about this. He didn't want to turn [youth] in. His reluctance, however, does not cause this Court to believe that it didn't happen. The Court is convinced beyond a reasonable doubt that on at least two separate occasions [youth] did touch [C's] penis, which is Sexual Abuse in the Third Degree, Counts 2 and 4.

"The Court also finds that [youth] did threaten [C] with a power drill, which is Menacing, Count 3. Count 5 has

already been dismissed at the conclusion of the State's case and upon motion of the Defense.

"Moving to [A], Counts 6, 7 and 8, three separate counts of Rape in the First Degree. I as I alluded to earlier, [A's] story over time, particularly in the second video does grow increasingly bizarre in regards to what is shared with her by [youth], but never waivers from what she says in the first video regarding the placement of his penis in her vagina. And it is corroborated to a certain extent by the observations of some of her siblings, the rubbing of [V] and [A] together.

"I am convinced beyond a reasonable doubt that [youth] did have sexual intercourse with [A]. I cannot be convinced beyond a reasonable doubt as to the number of times it occurred. I am convinced it occurred at least once, and for that reason I do find [youth] within the jurisdiction of the court on Count 6. I decline to find jurisdiction on Counts 7 and 8.

"[D], I think it was fairly characterized by everyone, was a difficult witness. [D] had a very difficult time talking here in Court. He had a difficult time talking on the video. The best evidence I could pull from [D's] comments, if anything, was sodomy. But he wasn't—[youth] was not charged with sodomy with [D].

"But [D's] comments escalated to that final outburst with Valerie Foster, which would have been sodomy if it was true. As I said though, that's not what [youth] was charged with regarding [D]. Consequently, the Court declines to find jurisdiction on Count 9, which is the only count applying to [D].

"Counts 10 and 11 apply to [Z]. Count 10 alleges Sodomy. [Z], without hesitation in Court, when asked that question stated that [youth] had sodomized him. That was confirmed on his video, that was confirmed in his interview with Dr. Strickland. He was consistent in that allegation, and I find him believable, and I do find [youth] in the Court's jurisdiction on Count 10, Sodomy in the First Degree.

"Count 11, which is Sexual Abuse in the First Degree, the only time I could find in my recollection and notes that it was mentioned at all by [Z] was on the video. He did not

tell Dr. Strickland about it, he did not testify about it. I cannot feel confident in finding beyond a reasonable doubt that sexual abuse in the first degree occurred, and so I decline to find jurisdiction on Count 11.

"Moving to [V], Counts 12, 13 and 14, the comments about [V] are very similar to the comments about [A]. [V] herself, of course, was not terribly clear about what happened or didn't happen except when leading questions were put to her. And everybody acknowledges that that's about the only way that one can talk with [V].

"But there's corroborating evidence from observations made by siblings and there is physical evidence from Dr. Strickland that some sort of penetration has occurred, and a thinning of the hymen. Again, the Court cannot find beyond a reasonable doubt that it occurred more than once, but I can find beyond a reasonable doubt, and do, that it did occur at least once with [V], and I do find [youth] within the Court's jurisdiction on Count 12.

"I decline to find jurisdiction on Count 13. I also decline to find jurisdiction on Count 14 regarding Sexual Abuse in the First Degree, because it was inconclusive on the evidence there.

"Turning to [E], Counts 15 and 16, [E] was straightforward in his testimony and believable and consistent in the video and in what he said in Court. I do find that [E] was sodomized, Count 15. I also find that [youth] touched [E's] penis, which was Count 16, Sexual Abuse in the First Degree.

"In all candor, and for the record, as I go along I find the decisions easier to make. If I was going to start with the easiest one, it would have been [S's]. I've already thrown out Count 19 regarding Sexual Abuse in the First Degree. Candidly, when I went through my notes again last night, I—I threw it out because there was no evidence to support it. I find that Dr. Strickland was told by [S], so I may have made a mistake yesterday, but that's water over—under the bridge, I'm afraid.

"But I am convinced beyond a reasonable doubt that on two separate occasions at [the elementary school, youth] sodomized [S], Counts 17 and 18.

"[G], also a believable witness, straightforward in Court, consistent in his video and with the doctor. The only

difference is what he told his mother sounded more like an attempted sodomy, with his mother, but the Court is convinced that Sodomy occurred with [G], as did Sexual Abuse in the First Degree when he 'pulled on his winkie hard.' Counts 20 and 21 are within the jurisdiction of the Court. That concludes the petition regarding the Linsday children.

"Regarding [the Helveys' child], two counts of Attempted Sexual Abuse in the First Degree, the Court is not convinced in that case, due in large part to the age of that case and, candidly, the demeanor of [J] both in Court and on the video. I cannot say with certainty, and certainly not beyond a reasonable doubt, that the events that allegedly occurred back in 1995 with [youth] and [J] did occur, and so I decline to find jurisdiction on Petition No. 98-0325B."

Having found youth within its jurisdiction, the trial court placed him on probation.

■■ On appeal, youth raises eight assignments of error. In his first assignment, youth argues that he was convicted based on "accusations elicited from the complainants through coercive methods proven to cause children to make false reports" in violation of the due process clause. Youth, however, did not argue below that it would violate due process either to admit the evidence or to use it against him. Rather, he argued below that the trial court should not credit the state's evidence. That argument is not sufficient to preserve the constitutional issue that youth seeks to raise in his first assignment of error. *See State v. Walton*, 311 Or 223, 238-41, 809 P2d 81 (1991). Although youth argues that we should reach his constitutional claim under the plain error doctrine, he has not established either that the error, if any, is plain, nor has he explained why we should exercise our discretion to reach his unpreserved constitutional claim. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991).

In his second assignment of error, youth argues that the trial court erred in permitting the state's experts to vouch for the witnesses' testimony. Youth acknowledges that the trial court sustained the only objections that he made on that ground, but he argues that there were other instances of vouching that the trial court should have addressed on its

own motion. In this area, the line between permissible and impermissible testimony can be a fine one, *see State v. Remme*, 173 Or App 546, 561-62, 23 P3d 374 (2001), and the testimony that youth cites in his brief does not rise to the level of plain error, if error at all.[12]

██ Even if there were plain error, we decline to exercise our discretion to reach any error. *Ailes*, 312 Or at 382 n 6; *cf. State v. Miranda*, 309 Or 121, 127-28, 786 P2d 155, *cert den*, 298 US 879 (1990) (declining to reach claimed error that may have been the product of the defendant's tactical decision). Youth's defense was based in large part on the claim that the children's testimony was the product of suggestive questioning, and his counsel reasonably could have concluded that the answers that youth now argues are objectionable properly anticipated that defense. Similarly, counsel reasonably could have concluded that asking the court to apply too strict a test to the state's expert would limit the ability of youth's expert to explain why, in his view, the children's testimony should not be credited. Because either decision could reflect a tactical choice on the part of youth's counsel, we do not exercise our discretion to reach the unpreserved issues that youth asserts as part of his second assignment of error.

In his third assignment of error, youth contends that "the trial court erred by permitting the prosecution's expert witness to provide expert testimony that is devoid of any scientific basis and is, in fact, squarely contradicted by scientific research literature[.]" Youth argues that, under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), the trial court should not have allowed a therapist, Valerie Foster, to testify about her treatment of either sexual abuse victims generally or the Linsdays' children in particular. As we understand youth's argument, he does not claim that the way in which sex abuse

---

[12] Youth relies on a "suggest[ion]" in *State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988), that trial courts have a *sua sponte* obligation to prevent such testimony from reaching a jury. In *State v. Wyatt*, 331 Or 335, 344, 15 P3d 22 (2000), the court reaffirmed that, as a general rule, a party must either raise an objection below or come within the plain error doctrine. The court specifically declined to impose an obligation on the trial court to reach the issue in that case *sua sponte*. *See Wyatt*, 331 Or at 344 (the trial court was not required to consider *sua sponte* whether a less drastic sanction would remedy a discovery violation). The holding in *Wyatt* negates the suggestion in *Milbradt*, on which youth relies.

victims are treated constitutes, as a general rule, novel scientific evidence. Rather, he argues that specific opinions that Foster expressed are novel because they are not consistent with recognized authorities in the field.

■　　Youth's third assignment of error suffers from two separate but related problems. First, youth did not object to Foster's testimony below. Second, his argument on appeal is based, in large part, on evidence that was not introduced below; that is, on appeal, youth seeks to impeach Foster's testimony with treatises that he could have but did not introduce into evidence. Youth's challenge to Foster's testimony comes too late. Although youth invokes the plain error doctrine, it does not apply here. As youth's own reliance on extra-record sources demonstrates, the problem that he perceives with Foster's testimony is not apparent on the face of the record. *See Ailes,* 312 Or at 381.

In his fourth assignment of error, youth argues that the trial court erred by permitting the children's mother to repeat their complaints to her under OEC 803(18a)(a). Youth assigns error to seven evidentiary rulings. The court, however, sustained four of youth's objections[13] and the fifth ruling has nothing to do with OEC 803(18a)(a)—the only basis that youth identifies in his fourth assignment of error for saying that the trial court erred.[14]

Only two rulings that youth assigns as error are properly before us. Both address a similar point. After Ms. Linsday testified that C had "told [her] that some things had happened with [youth] in the pigeon coop that were inappropriate," the state asked what youth told her. Youth

---

[13] The court sustained three exceptions and agreed with a fourth, directing the prosecutor to "limit [herself] to an 18-A question at this point."

[14] Ms. Linsday testified that A's bedroom looked out on youth's house and pigeon coop and that she was frightened at night that youth's family was watching them. Ms. Linsday testified that the child woke up screaming many nights, "and when [Ms. Linsday's husband] has often been the first one there, she's just sitting up in bed just shaking." Youth's counsel objected because the witness was "testifying to what another person witnessed." The court overruled the objection, reasoning that "[i]t's a statement based on foundation at this point." Youth's objection below appears to have nothing to do with OEC 803(18a)(a), and he offers no argument in his brief to explain why the court's ruling was erroneous. In any event, we do not consider the witness's answer on *de novo* review.

objected, and the trial court ruled: "Well, we need to determine whether we're talking about sexual misconduct or not; so, I'm going to allow it for that purpose." The witness answered: "He told me that [youth] had exposed his penis to him and that he had touched—that [youth] had touched—." Youth objected again, saying "if we're going to go this way * * * I would ask counsel [to] ask more specific questions rather than open-ended[.]" Youth added: "[I]f we're going to go beyond the fact that a simple complaint was made, I do insist that the child testify first under the second rule." Given that objection the trial court ruled:

> "It's not a simple complaint, obviously. The answer to the question was that he had exposed himself and attempted to get him to touch it. That is sexual misconduct, and that's a complaint of sexual misconduct. That answer is allowed by 18(a). The objection is overruled. Anything beyond that is likely to be running afoul of 18(b)."

The Supreme Court has held that comparable detail is admissible under OEC 803(18a)(a). *See State v. Campbell,* 299 Or 633, 646, 705 P2d 694 (1985). Neither ruling that youth has assigned as error is erroneous. Indeed, in his argument, youth does not focus on those two rulings. He focuses instead on answers to which no objection was raised below. He argues that those answers ran afoul of both OEC 803(18a)(a) and the federal constitution.[15]

■■ The statutory and constitutional issues that youth seeks to litigate on appeal were not preserved, nor is it appropriate to reach them under the plain error doctrine. *See Ailes,* 312 Or at 382 n 6; *cf. Miranda,* 309 Or at 127-28. The children testified at trial in greater detail to the statements that their mother repeated in her testimony. Youth could have reasonably concluded that, in light of the children's anticipated testimony, an objection to their mother's testimony would serve little purpose.[16] Because youth's counsel may have had valid

---

[15] Youth had asked for a continuing objection under OEC 803(18a)(a), but the court required counsel to object to each question that she thought was objectionable.

[16] To the extent that reports that the children made to Ms. Linsday differed from their testimony at trial, their reports to their mother provided a baseline from which youth could argue that the children's testimony at trial had changed over time and was the result of improper questioning—a primary part of youth's case.

tactical reasons for not objecting to the testimony, we decline to exercise our discretion to reach any error under the plain error doctrine.[17]

7. In his fifth assignment of error, youth argues that the court erred in ruling that OEC 412 prevented him from introducing evidence of the children's past sexual conduct. In the notice that he filed with the court, youth explained that he wanted to introduce evidence that (1) "[s]everal of the complainants have been sexually abused by siblings or others," (2) "[Z] has sexually abused at least two of his brothers," and (3) "[C] sexually assaulted at least two of his younger siblings[.]" The trial court asked youth's counsel to explain the basis for admitting this evidence under OEC 412. Counsel responded that the primary reason for admitting the evidence of C's past sexual behavior was "to rebut the medical evidence and to show that any medical evidence that exists [concerning damage to V's hymen] may be explained by the fact that these children had had prior sexual contact with [C] or perhaps another sibling." Counsel said that she wanted to introduce the evidence concerning Z and C to impeach statements that their brothers and sisters made at a counseling center and also to the police.

The trial court ruled that, although OEC 412 is "not a totally impenetrable wall, it is a very high and very dense wall." The court noted that the evidence that youth sought to elicit "[does] not tend to show a potential bias or motives of these witnesses as to this defendant, nor to rebut any physical evidence." It then qualified its ruling:

> "It is possible, the one thing that causes me a little bit of concern—and I guess I'm just not prepared to rule on it until the evidence is before me—is the evidence in regard to the possible medical examination and medical proof of penetration of one of the children.

---

[17] As part of his fourth assignment of error, youth also argues that the trial court erred in allowing the children's medical doctors to repeat what the children told them. Youth, however, did not preserve this issue below. The error, if any, is not plain. *See State v. Moen*, 309 Or 45, 54-59, 786 P2d 111 (1990) (explaining the criteria for admission under OEC 803(4)). Even if it were, we decline to exercise our discretion to reach the issue when, as in this case, youth's failure to object deprived the state of the opportunity to make a more complete record on the question whether the statements were admissible.

"Depending on the time frame and how that comes in, it is possible the Court may conduct an in camera hearing of one of the children in regard to that issue. But until I'm otherwise convinced there's a need to do so, I am denying the defense's right to present any evidence in chief or by way of cross-examination of these witnesses of their past sexual behavior, and I will not at this time conduct an incamera hearing."

Midway through trial, youth returned to the issue that the court had left open. Youth's counsel explained that she wanted to introduce evidence that "may help rebut or cast doubt on whether [youth] was responsible for any medical changes in [V's] hymen." When the trial court asked counsel "specifically what it is you intend to offer[,]" she replied:

"Number one, there's a reference of Shelley Linsday we'd like to explore in the very beginning of this when she tells the officer [Z] has sexually acted out with two siblings. And I think one of them is [E], and the other—I'm not sure—but I think it was [S]. And that's all she says; it's just a general thing. And we want to explore that with her on cross-examination.

"And then number two, the references from Dr. Richmond in the notes before the family moved next door regarding C being sexually inappropriate with siblings."

Counsel explained that, before the Linsdays moved next door to [youth] in 1995, "[C] was sexually acting out with his siblings, including [Z]; and although the others aren't named, apparently the girls, because he's not allowed in their bedroom."

In response to the court's questions, counsel clarified that she wanted to introduce evidence of events that occurred four or five years before youth allegedly assaulted the Linsdays' children. The state responded that there was no evidence that V's injuries were that old. It argued:

"As far as to rebut medical testimony, the State is not aware of any sort of medical testimony out there that would show that [V's] hymen was damaged in any way prior to this incident. And I'm sure the defense, if they have any evidence of that, they have a right to present that in their case."

The trial court asked the defense if it had anything further. The defense said, "No." Defense counsel did not argue that there was any evidence that the damage to V's hymen was contemporaneous to the evidence of acting out that counsel sought to introduce. After considering the parties' arguments, the trial court reaffirmed its earlier OEC 412 ruling. It added: "The Court also finds there's an insufficient basis to find there would be any medical evidence which would be rebutted by opening [the inquiry] up in this fashion. The Court finds there's n[o] other constitution[ally] required material that is to be admitted at this point."

A three-step analysis applies under OEC 412:

"First, [a court] must determine whether the evidence concerns a victim's 'past sexual behavior.' If it does not, it is not appropriate for it to make further inquiry under OEC 412. Second, if the evidence does concern past sexual behavior, and is offered in the form of opinion or reputation, the court must deny its admission under OEC 412(1). If it is offered in some other form, then the court must determine whether the purpose of the offer fits within one of the exceptions in OEC 412(2)(b)(A), (B) or (C). If it does not, then the court may not admit the evidence. Third, if it does fit within an exception, the court must balance the probative value of the evidence against its prejudicial effect."

*State v. Wright*, 97 Or App 401, 405, 776 P2d 1294, *rev den*, 308 Or 593 (1989). Youth did not argue below that his proffered evidence did not concern the victims' "past sexual behavior,"[18] and the evidence was not offered in the form of opinion or reputation evidence. Accordingly, the only questions before us are whether the evidence comes within one of the three exceptions set out in OEC 412(2)(b) and, if it does, whether the trial court abused its discretion in ruling that the evidence's prejudicial effect outweighed its probative value.

■ OEC 412(2)(b) specifies three exceptions to the general prohibition against admitting evidence of a victim's past sexual behavior. The evidence may be admitted only if it "[r]elates to the motive or bias of the alleged victim[,]" "[i]s necessary to rebut or explain scientific or medical evidence

---

[18] Youth advances that argument on appeal, but it was not preserved.

offered by the state," or "[i]s otherwise constitutionally required to be admitted." OEC 412(2)(b)(A), (B), and (C). Youth argues that the evidence was admissible under the first exception to show the interviewers' bias. Youth's argument misses the mark. Even if the evidence was relevant to show the interviewers' bias, a proposition that is questionable at best, OEC 412(2)(b)(A) permits evidence of a victim's past sexual conduct to be admitted to show only the victim's motive or bias. It does not permit evidence to be admitted to show someone else's motive or bias.[19]

Youth also argues that the evidence was admissible to rebut the medical evidence that V had a thin hymen, which was consistent with repeated penetration. *See* OEC 412(2)(b)(B); *State v. Muyingo*, 171 Or App 218, 225, 15 P3d 83 (2000). Although youth's counsel characterized the evidence broadly in the pretrial notice that she filed with the court, counsel described the evidence in a more limited way when she responded to the trial court's questions midway through trial. Counsel told the trial court that youth wanted to introduce evidence that Z had "acted out" with two of his brothers. Similarly, he wanted to introduce evidence that C had been "sexually inappropriate" or had "sexually acted out" with Z and perhaps other unnamed siblings some time ago.

In this case, however, the only allegation was that Z had acted out with his brothers and that C had acted out with Z and perhaps other unnamed siblings. There was no specific allegation that either Z or C had acted out with V or any of their sisters. Given those allegations, the trial court correctly found that "there's an insufficient basis to find there would be any medical evidence which would be rebutted by opening [the inquiry] up in this fashion." That is, the trial court correctly found that the allegations, even if true, were not relevant under OEC 412(2)(b)(B).

The final question is whether the evidence "[i]s otherwise constitutionally required to be admitted." OEC 412(2)(b)(C). In his trial memorandum, youth argued:

---

[19] Youth also argues that the evidence was admissible to impeach statements that the children made to the police, but OEC 412 does not permit evidence of past sexual abuse to be admitted for that purpose. *See State v. Gilliland*, 136 Or App 580, 587, 902 P2d 616 (1995).

"The complainants' past sexual behavior relates to the motives or biases of alleged victims to falsely accuse [youth], is necessary to impeach, rebut or explain the psychological or medical evidence to be offered by the state and is otherwise constitutionally required to be admitted."

Beyond paraphrasing the language of the OEC 412, youth did not argue that the state or federal constitution required the evidence's admission. Although youth advances an extensive constitutional argument on appeal, he did not preserve his constitutional claim below. *State v. Riggs*, 143 Or App 427, 430, 923 P2d 683 (1996), *rev den*, 325 Or 247 (1997). The trial court did not err in excluding youth's evidence under OEC 412.

 In his sixth assignment of error, youth argues that the evidence does not support the trial court's findings. Although we review the facts *de novo*, the trial court's "determinations of credibility are given significant weight when based on the [court's] perception of a witness's demeanor." *In re Schenck*, 318 Or 402, 420, 870 P2d 185, *cert den*, 513 US 871 (1994); *State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 319, 884 P2d 885 (1994). The deference, however, that we owe the trial court's credibility findings lessens when the findings turn on other factors, such as internal consistency, logic, and corroboration. *See In re Schenck*, 318 Or at 420-21.

Before turning to the parties' arguments on this issue, it is helpful to put them into context. Youth argues that the children testified at trial to events that never happened. Generally, youth does not argue that the children were intentionally lying. Rather, he argues primarily that their trial testimony was the unwitting product of improper questioning. In support of his argument, he contends that (1) the suggestive questions that Ms. Linsday and the police asked the children contaminated them and made their testimony unreliable, (2) there is no corroborating evidence to support the children's trial testimony, and (3) some of the children made statements about their brothers and sisters that their brothers and sisters did not corroborate. It follows, youth reasons, that none of the children's testimony should be believed.

The state responds that we should not accept youth's all-or-nothing approach. It observes that Ms. Linsday testified that she did not ask the children leading questions and that the trial court accepted her testimony. It follows, the state reasons, that the children's reports to their mother form a reliable body of evidence, and it asks us to look for consistency among the statements that the children made to their mother, to the counselors, to the police, and at trial. The state does not dispute that the officers asked some suggestive questions, and it does not ask us to take all of the children's testimony at face value. Implicitly, the state recognizes that some of the officers' questions may have caused some of the children to offer some testimony that should not be accepted. But it does not follow, the state argues, that all of the children's testimony should be rejected. The state also argues that youth overstates the degree to which the police's questioning affected the children's answers. It concludes that, in parsing through the evidence, the trial court correctly weeded out the implausible and inconsistent testimony and relied on core, consistent testimony to find that youth was within its jurisdiction on 12 of the 21 counts.

█ We turn to youth's specific arguments. He offers essentially four reasons why none of the children's testimony should be believed. He argues primarily that "[n]ot a single accusation was made until, and unless, the children were questioned by adults whose methods of questioning—demonstrated in the record—have been proven to cause children to make false reports." Youth paints with too broad a brush in at least three respects.

C approached Ms. Linsday on Thursday and told her what youth had done. Ms. Linsday testified that, when she spoke with the other children on Monday and Tuesday, "it seems as if the conversation got started with each child [asking], 'What is happening with [youth]?'" She or their father answered, "There's some problems right now, [youth's] going to be staying in Medford for a little while," and that each of the children "said something to the effect of, 'Mommy, I need to talk with you.'" At that point, Ms. Linsday explained that she went to a place where she could talk privately with each child and that she "just held the child's hand or sat next to the child and they started talking to me." The trial court credited

Ms. Linsday's testimony, and youth identifies no valid reason on appeal not to defer to that credibility determination. We agree with the state that the children's reports to Ms. Linsday provide a reliable core of evidence, untainted by suggestive or overreaching questioning, from which we can determine whether youth committed the acts set out in the jurisdictional petition.

We also agree with the state that not all of the subsequent questioning was improper or unduly suggestive. The children's responses to open-ended questions from some of their therapists or counselors confirm their initial reports to their mother. For example, before the police interviewed A, she reported to Dr. Barbara Sibley that youth had sexually abused her. Similarly, before the officers spoke with C, he disclosed to his therapist, Toni Richmond, that youth had sexually abused him.

Finally, having reviewed all the videotaped interviews, we do not agree with youth that all of the officers' questions were improper or unduly suggestive. To be sure, the detective who questioned V and A frequently asked leading questions, and A's testimony, as the trial court noted, grew increasingly bizarre over time. The other officer was more circumspect in his questions. Beyond that, youth's own expert witness agreed that the studies on which he relied focused on preschool children. He also agreed that a child's testimony is more likely to be distorted after multiple suggestive interviews. Finally, youth's expert agreed that several of the children's responses to the officers appeared to be spontaneous and that "we can have more confidence in a child's spontaneous statement than in answers to leading questions."[20] In short, we agree with the trial court that, although the officers could have done a better job, we should not discredit everything that the children said.

Youth advances a second argument. He argues that the children's testimony was not consistent. He notes that

---

[20] We note that, in several instances, the children who were being interviewed were not swayed when the officers in fact asked leading questions. C, for example, agreed that youth may have slipped his hands into C's pants, but he resisted any suggestion youth put his mouth on C's penis.

some of the children reported that youth engaged in sexual contact in front of other children. He notes that the other children did not always report those incidents. It is true that the children's testimony did not match in every respect. It was, however, consistent in many respects. For example, Z told the officers that youth made G sit on his lap in the swing and tried to pull down G's pants. G told the officers substantially the same thing. Z also told the officers that he saw youth pull his pants and V's pants down and rub against her. Z said that he had seen youth do the same thing to A, the same day. A told the officers that youth had sexually assaulted her three times. She said that V was there each time that it had occurred and that Z was there the second time it had occurred. Z's statements corroborated A's.

In light of the number of incidents reported in this case and the age of the children, it is not surprising that the children's testimony was not completely consistent. We decline to conclude from that fact that we should disregard all of the children's testimony or completely discount all of the trial court's credibility findings. Rather, in deciding which of the charges had been proved beyond a reasonable doubt, the trial court carefully reviewed each witness's testimony and considered whether there was consistency within that witness's reports and whether there was corroboration among the witnesses. The trial court took a more judicious view of the evidence than youth urges.

Youth advances a third argument. He contends that he could not have committed these acts either without someone noticing or without leaving some physical evidence behind. There was, however, evidence that corroborated the children's reports. The doctor who examined V testified that the posterior aspect of her hymen was "very thin," which was "evidence of penetration of [V's] hymen with an object that is large enough to cause stretching of the hymen." The doctor explained that "something * * * had penetrated through [V's] hymen more than once to cause the thinning of the hymen that [she] saw." Although there was no comparable evidence for the other children, the doctors testified that the sexual abuse and various kinds of sodomy that the children reported could have occurred without leaving any observable physical

evidence, at least by the time that the doctor examined the children.[21] In addition, the children's mother reported emotional and behavioral changes in her children that occurred during the time that they had contact with youth. While it is true that no one caught youth in the act of sexually abusing the children or noticed evidence of the abuse, the absence of that evidence does not persuade us that we should discredit the children's testimony completely.[22]

Finally, youth argues that the trial court should not have believed C because he "had a history of making abuse accusations." In 1997, C told Ms. Linsday and his therapist that Martha Ware, his first foster mother, had broken a switch off of a tree and had swatted his legs. He said that she had had put something "bad tasting in his food" and that she had held him upside down over the toilet or bath water. Finally, he said that she put something like a plastic toothpick in his penis and had taken him to a shooting gallery and shot him in the back with a gun. He also reported that Millie Williams, his second foster mother, had hit him across the back with a yard stick.

Youth called the two foster mothers to testify. The first acknowledged that C had been a "difficult child." She denied giving him bad tasting food, holding him over water, or "beat[ing] him on the back leaving scars." She admitted

---

[21] For example, the doctor who examined S explained that the stinging that he reported when youth sodomized him "could very easily heal, and you'll get a normal exam then; so you won't necessarily see any changes on the exam with the history like he gave."

[22] In a related vein, youth argues that some of the children testified to photographs that the police did not find. As described by the children, some of the pictures appeared to be commercial pictures; others were photographs of youth and others. On appeal, youth argues that we should discredit the children's testimony because "[a]lmost none of th[os]e items" was recovered when the police executed a search warrant at youth's home. C reported the abuse to his mother on April 16, 1998. The police executed the search warrant on June 5, 1998. The officers found some commercial pictures that corresponded with some of the pictures that the children had reported. The officers did not find a photograph album with pictures of youth and others. Between the time youth was arrested and the warrant was executed, some magazines that youth admitted possessing were no longer in his room. Additionally, T, whom the children said had been involved in abusing them, stated that he had been in the pigeon coop and had taken some items from the coop before the police executed the search warrant, although he denied that he had seen or taken any photographs. Given the time lag and the loss of some evidence, we do not find the absence of the photographs dispositive.

that she had taken C by a shooting gallery at a carnival but denied having done anything to him. The second foster mother agreed that C had been a "difficult child to take care of" because of diabetes and his behavior but denied ever hitting him with a yardstick or "punish[ing] him in a way that * * * would have left any scars on his back or bumps on his back[.]" In addition to C's testimony and the trial court's ability to judge his and the other witnesses' demeanor when they testified, the state put on evidence from a tutor who had worked with C daily from May through August 1997. She testified that, in her opinion, "[C] is a truthful person, and I feel he's a person with a lot of integrity."

Having considered the witnesses and the evidence, the trial court credited C's testimony. The trial court reasonably could find that much of what C reported—the physical discipline and bad tasting food—was not surprising given his challenging behaviors and the limited kinds of food that he could eat as a diabetic. Other claims, such as the claim that his first foster mother had shot him and inserted some sort of object in his penis, are more troubling. C, however, stayed with her when he was quite young,[23] and the trial court reasonably could have attributed those perceptions to C's young age.

The trial court, in short, credited C's testimony that youth had sexually abused him and discredited youth's testimony that he had not. The trial court was able to observe both C and youth testify and to judge, based on each witness's demeanor, which witness the court believed. Given the deference that we owe the trial court's credibility findings, we decline to second-guess the trial court's first-hand observations of the witnesses.

Although youth does not argue the point specifically, we note that portions of A's testimony, specifically the portions that began in her second police interview, were not credible. We agree with the trial court, however, that her earlier statements, particularly her statements to the doctor and during the first police interview, are internally consistent and consistent with Z's statements to the officer. We agree

---

[23] C lived with Ware from the time he was two years old until he was six.

with the trial court that those statements are credible. We also defer to the remainder of the trial court's credibility findings. In sum, on *de novo* review, having considered the evidence and all of youth's arguments, we agree with the trial court that the state proved beyond a reasonable doubt that youth was within its jurisdiction on 12 of the 21 counts in the petition.

 In his eighth assignment of error, youth argues that his two trial attorneys were constitutionally inadequate.[24] Youth's argument consists of the following sentence: "[I]n the event that this Court finds that any or all of the arguments presented above are meritorious and would require reversal but for some action that trial counsel neglected to take, trial counsel was ineffective in that regard." Even if youth may challenge the adequacy of his trial counsel on direct appeal, *see State ex rel Juv. Dept. v. Rial*, 181 Or App 249, 265, 46 P3d 217 (2002), youth has not established that his trial counsel were inadequate. To the contrary, the trial court observed:

> "To say that this has been a complicated and difficult case would be probably the most gross understatement I could make, and I'm appreciative to the lawyers for the good job that they have done. Both parties have been well served by counsel, both for the State and for the Defense in this case.
>
> "I appreciate their courtesies to one another, I appreciate their courtesies to the Court. This has been an extremely well tried case, and given the difficulties of it, you are all to be commended for that."

We agree with the trial court. From all that is apparent from the record, youth's counsel did a commendable job with a difficult case. On appeal, youth's new counsel argues that trial counsel should have taken a different tack. Some of youth's arguments on appeal are misplaced. Others call into question what could be legitimate tactical choices. In this posture and on this record, youth has not proved that his trial counsel were inadequate. *See Rial*, 181 Or App at 265-66.

Affirmed.

---

[24] In his seventh assignment of error, youth argues that the cumulative effect of the trial court's errors requires reversal. The Oregon courts have never explicitly adopted the cumulative error doctrine. Even if the doctrine applies, there was no cumulative error here.