Argued and submitted July 17, 2003, reversed January 21, 2004

In the Matter of
Tara N. Black, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF WASCO COUNTY,
*Respondent,*

*v.*

Tara N. BLACK,
*Appellant.*

J01063; A117892

83 P3d 338

Kurt C. Peterson argued the cause for appellant. With him on the brief was Morris & Olson.

Julie A. Smith, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Linder, Judge.

LINDER, J.

Deits, C. J., dissenting.

**LINDER, J.**

Youth appeals the juvenile court's order declaring her to be within its jurisdiction for committing acts that, if committed by an adult, would constitute first-degree sexual abuse, ORS 163.427(1)(a), and first-degree sodomy, ORS 163.405(1)(b). *See* ORS 419B.100(1)(c). Youth assigns error to the admission of hearsay statements of the alleged victim, in the form of a videotaped interview and statements that the victim made to his mother, under OEC 803(18a)(b). In addition, she contends that the evidence was insufficient to find her within the juvenile court's jurisdiction beyond a reasonable doubt. On *de novo* review, ORS 419A.200(6)(b), we conclude that, even with the challenged hearsay statements, the record is insufficient to support jurisdiction. We therefore reverse without reaching the evidentiary issue.

The delinquency petition in this case stemmed from youth's alleged sexual abuse of a four-year-old boy ("child") while she was babysitting him at his home on the evening of June 5. McNamara, child's mother, knew youth from her involvement with a youth group at the Salvation Army, where McNamara worked as a youth group leader, and had hired youth as a babysitter in the past without incident. At the hearing on the petition, McNamara testified that youth babysat child for about three hours on the night of the alleged incident while McNamara worked at the Salvation Army. When McNamara came home, child and youth were on the couch in the living room, and child was wearing pajamas, lying down and pretending to be asleep. Child then jumped up and yelled, "Boo!," trying to scare his mother. McNamara and child drove youth home, then returned and watched television together. McNamara testified that, after approximately 15 minutes, child, "just out of the blue," said,

> " 'Mom, [youth] unzipped my pajamas.' And I said, 'Well, what do you mean she unzipped your pajamas; don't you mean she * * * helped you get your pajamas on.' And he said * * *, 'She unzipped my pajamas and touched me down there.' * * *
>
> "* * * * *

"He pointed down; you know, he pointed down. And I said, 'Do you mean your leg?' And he said, 'No, she touched me right there,' and he pointed down to his penis. * * * I said, 'How did she touch you there?' And he made a kissing motion. And I said, 'She kissed you down there?' And he said, 'Yes.' * * * And I said, 'Why?' He goes, 'Well, maybe she forgot.' And I said, 'What do you mean "she forgot?"' 'Well, she forgot she's not suppose[d] to do that.' "

McNamara testified that, after that conversation with child, she took him to her mother's house next door and told child to repeat to his grandmother what he had told McNamara; child then "told [his grandmother] the same thing."

The next day, McNamara drove youth's sister, Brittany, home from a party at the Salvation Army. She saw youth outside when she dropped Brittany off and, while child remained in the van, she confronted youth with child's accusation. McNamara asked youth if she had kissed child's penis, and youth replied, "Well, that's gross. I wouldn't do something that gross." McNamara testified that she then took youth over to child and said, "child, [youth] is telling me that she didn't do that." Child responded that she had, and when youth denied it, child again stated that she had, and became upset. Thereafter, youth no longer attended youth group meetings or participated in activities at the Salvation Army.

The day after she confronted youth, McNamara reported child's accusations to what is now the Department of Human Services (DHS) (formerly the State Office for Services to Children and Families). A DHS worker, Melum, and Officer Rosebraugh of the Oregon State Police conducted a videotaped interview of child about the accusations. During that interview, child responded to questions about the alleged abuse:

"[Melum:]    Well, do you know why you're here today to talk to us?

"[Child:]    Yeah.

"[Melum:]    Why?

"[Child:]    Cause [youth] did a bad thing.

"* * * * *

"[Melum:]   And what bad thing did she do?

"[Child:]   Rubbed on me.

"* * * * *

"[Melum:]   Where did she rub on you?

"[Child:]   Down. [After further questioning, indicating his penis]

"* * * * *

"[Melum:]   And what did she rub on you with?

"[Child:]   With her—uh, um, the same thing. [After further questioning, indicating youth's vagina]

"* * * * *

"[Melum:]   And when she rubbed on you, did she have—how were your clothes?

"[Child:]   Jeans. And then—and then I had—I changed into my pajamas * * *.

"* * * * *

"[Melum:]   And where were you in the house when this happened?

"[Child:]   Um, in the living room where our gray couch is.

"[Melum:]   And where were you in the living room?

"[Child:]   On the couch. Fake—um, fake sleeping fake."

Child went on to tell Melum that youth also touched his penis with her hand, more than once. When asked if youth did anything else, child told Melum that youth kissed his penis. Later in the interview, child and Melum had the following exchange:

"[Melum:]   [Child], you told us that [youth] also [in addition to kissing your penis] rubbed on you?

"[Child:]   Yeah.

"[Melum:]   With her hands. And—

"[Child:]   No, that was her vagina.

"[Melum:]   Oh, she rubbed on you with her vagina?

"[Child:]   Like her boy—like Brittany's boyfriend.

"[Melum:]   Who's Brittany?

"[Child:]   Her sister.

"[Melum:]   Okay. So she rubbed on your penis with her vagina?

"[Child:]   Yeah.

"\* \* \* \* \*

"[Melum:]   Did she rub on you with her vagina before or after she kissed your penis?

"[Child:]   After—after she kissed my penis.

"[Melum:]   Okay.

"[Child:]   I'm good at talking at questions.

"[Melum:]   Yeah, you're doing a good job answering questions.

"[Rosebraugh:]   You're very smart. You're a very smart boy.

"[Melum:]   When—when did she—what happened after she rubbed on you?

"[Child:]   Then she did it again and again and again and again and again and—like more than a hundred. She did it again, again, again, again, again, again and again.

"[Melum:]   When did she touch your penis with her hand?

"[Child:]   With—when I was fake sleeping again.

"[Melum:]   Was that after she rubbed on you again and again and again?

"[Child:]   Yeah. She just kissed my penis more and more and more."

Later that same day, Rosebraugh and another detective went to youth's home to discuss the alleged abuse, which youth denied. The detectives decided to take youth to the juvenile detention center to question her privately. Because youth was barefooted, they told her to put on shoes. Youth, who by then seemed "kind of sad and upset" to Rosebraugh, left the room, followed by her sister Brittany. When she did not return after a few minutes, the detectives, youth's mother, and youth's sister Brittany looked for her outside.

Brittany evidently saw youth hiding under a car in the alley behind the house, at which point youth went back inside. The detectives ordered her to come to the front door, which she did, at which point she told the detectives that she did not want to "go to jail" and asked if somebody could go with her. The detectives insisted that she go alone, handcuffed her, and took her to the detention facility for further questioning.

Before the alleged abuse took place, McNamara often took child to her workplace at the Salvation Army, where he was free to explore the facility while she led youth groups. She testified that, "[i]f he feels like going up to play in the game room upstairs, then he plays games up there; but if he gets bored he'll come down and interrupt the group * * *." McNamara did not allow child to attend teenage group meetings, however, because the teenagers often used inappropriate language (i.e., swearing) and child had mimicked their behavior in the past.

McNamara testified that child exhibited some "very inappropriate behavior with some other kids" in the weeks following the alleged abuse. Specifically, child would go up to other children and try to kiss them. Child also approached McNamara's boss at the Salvation Army and "asked him what sex was." When McNamara asked child why he was asking about sex, he responded, "[b]ecause that's what [youth] said that we were going to do" or "[t]hat's what [youth] said we were doing." McNamara was also aware of one time before the alleged abuse when child had exhibited sexual curiosity. That occurred at a Salvation Army youth retreat, where one of McNamara's coworkers saw child and a four-year-old girl "exploring each other; just showing each other that they looked different."

At the hearing, youth called Maki, a 10-year-old girl who attended youth group meetings and activities at the Salvation Army, as a witness. Maki was involved with the Salvation Army through approximately mid-June, at which time she stopped attending. Maki testified that she was not in youth's group but knew her from seeing her at the Salvation Army and through youth's sister, Brittany. She also knew child from seeing him at group meetings and in the Salvation Army game room. She testified that she saw child

try to kiss other girls, including youth, in the game room. On one occasion, youth was lying down on the floor in the game room, and child repeatedly tried to climb on top of her and kiss her on the lips. Maki stated that youth would respond by moving child away from her but that he would come back and try to climb on her again. The third time, according to Maki, youth took child downstairs to his mother. Maki also testified that she does not believe that child is a very truthful person.

Youth testified at the hearing. Like Maki, she testified that she had seen child approach girls at the Salvation Army and try to kiss them on the cheek and lips. She testified that child had climbed on top of her while she was lying down in the game room and had tried to kiss her multiple times. According to youth, that occurred before she started babysitting child. She denied ever touching child's penis with her hand, mouth, or vagina.

The juvenile court admitted McNamara's testimony about the statements child made to her, as well as the videotape of child's DHS interview, pursuant to OEC 803(18a)(b), the exception to the hearsay rule for statements made by children concerning sexual abuse.[1] At the conclusion of the hearing, the juvenile court found youth within its jurisdiction, telling youth, "I'm convinced you did what you're charged with doing." The juvenile court made no findings of fact in reaching its decision.

On appeal, youth raises two assignments of error. First, she argues that the trial court erroneously admitted child's hearsay statements to his mother and his videotaped statements under OEC 803(18a)(b) because the statements were unreliable and the state did not provide sufficient corroboration of the act of abuse as the rule requires. Second, youth argues that, in all events, the evidence presented at the hearing did not establish beyond a reasonable doubt that she committed the acts charged. The state argues the converse: that child's statements were sufficiently corroborated

---

[1] OEC 803(18a)(b) allows admission of out-of-court statements concerning an act of abuse if the declarant either testifies at the proceeding subject to cross-examination, or is unavailable and, as pertinent here, was under 12 years old at the time of the statement. Section (18a) applies "to all civil, criminal and juvenile proceedings." OEC 803(18a)(c).

and reliable to be admitted under OEC 803(18a)(b) and that the evidence was sufficient for the court to find youth within its jurisdiction.

■ We need not reach youth's first assignment of error, because we agree with her second. We are unconvinced on *de novo* review that the evidence adduced at the hearing—even considering the statements that youth contends are inadmissible hearsay[2]—prove beyond a reasonable doubt that youth committed the acts with which she was charged.

---

[2] In their briefs, the parties assume that OEC 803(18a)(b) required the state, in order to admit child's out-of-court statements, to present evidence corroborating the act of abuse. At oral argument, the state directed our attention to the phrase "in a criminal trial" that appears in the statute, suggesting that the corroboration requirement does not apply to a juvenile adjudication. *See State ex rel Juv. Dept. v. Reynolds*, 317 Or 560, 563, 857 P2d 842 (1993) (a juvenile delinquency proceeding is not a criminal prosecution for purposes of constitutional jury trial provisions); *State v. Thompson*, 166 Or App 370, 382, 998 P2d 762, *rev den*, 331 Or 192 (2000) (juvenile adjudications are not criminal proceedings, as referred to in the aggravated murder statute); *see also* ORS 419C.400(4) ("An adjudication by a juvenile court that a youth is within its jurisdiction is not a conviction of a crime or offense.").

We appear to have assumed in past cases that corroboration is required for a statement to be admitted in a juvenile proceeding under OEC 803(18a)(b). *See, e.g., State ex rel Juv. Dept. v. Sauer*, 189 Or App 78, 85-86, 73 P3d 293 (2003). That assumption is open to closer examination. OEC 803(18a)(b) generally applies to criminal, civil, and juvenile proceedings. *See* OEC 803(18a)(c). Thus, hearsay statements of an act of abuse are admissible in such proceedings if the declarant testifies or is unavailable and under 12 years of age. But the special requirement for corroboration of the act of abuse applies only to "criminal trials":

"[I]f a declarant is unavailable, the statement may be admitted in evidence only if the proponent establishes that the time, content and circumstances of the statement provide indicia of reliability, *and in a criminal trial that there is corroborative evidence of the act of abuse and of the alleged perpetrator's opportunity to participate in the conduct* and that the statement possesses indicia of reliability as is constitutionally required to be admitted."

OEC 803(18a)(b) (emphasis added). That limitation is in notable contrast to the 1989 version of OEC 803(18a)(b), which expressly required corroboration in both criminal trials and juvenile court proceedings:

"A statement made by a child victim who is under 10 years of age, which statement describes an act of sexual conduct performed with or on the child by another, is not excluded by ORS 40.455 if the statement is offered as evidence *in a criminal trial or juvenile court proceeding* and if the child either testifies at the proceeding and is subject to cross-examination or is unavailable as a witness[.] * * * However, when the child is unavailable as a witness, the statement may be admitted in evidence only if there is corroborative evidence of the act of sexual conduct and of the defendant's participation in the conduct."

OEC 803(18a)(b) (1989) (emphasis added).

At least three factors combine to create reasonable doubt in this case. First, child's reports to his mother and to the investigators who conducted the DHS interview differ substantially. When child reported the alleged abuse to McNamara soon after they returned from taking youth home on the night in question, he told her only that youth "touched" his penis; when asked how youth touched him, he made a kissing motion. McNamara asked child several questions about the incident and took him to her mother's house so he could repeat his story to her. His grandmother, who did not testify at trial, apparently asked child several questions about the abuse. In describing that exchange, McNamara did not indicate that child added to his account when he described the contact to his grandmother. Yet two days later, when child was interviewed by Melum and Rosebraugh and was initially asked what "bad thing" youth had done to him, he told them that youth rubbed on his penis with her vagina and her hand—accusations that, according to the record, child never made to his mother or grandmother. Although child's accounts are not necessarily contradictory—it is possible that for some reason child did not fully relay the details of the abuse to his mother—the fact that child's accounts of the abuse differed on the two occasions raises doubt as to his believability.

Second, child's descriptions of the alleged abuse in the DHS interview reveal at a few points embellishments of his claim. Right after Melum and Rosebraugh told child that he was "doing a good job answering questions" and was a "very smart boy," child told them that youth rubbed on his penis with her vagina "again and again and again and again and again and—like more than a hundred. She did it again, again, again, again, again, again and again." Then, after Melum and Rosebraugh responded by asking what happened after youth "rubbed on you again and again and again," child answered that youth "just kissed my penis more and more

---

The elimination of the language "juvenile court proceeding" adds force to a conclusion that the legislature did not intend, given the language of the current version of the statute, to apply any corroboration requirement in juvenile court proceedings. *See State v. Webb*, 324 Or 380, 390, 927 P2d 79 (1996) (prior versions of the same statute are part of the context to consider in interpreting a current version of the statute). Given our disposition of this case, and because neither party has briefed the issue, we note but do not resolve the question.

and more." On our review of the videotape, we find the impression of embellishment inescapable at those points of the interview.

Finally, child's comment to Melum and Rosebraugh that youth rubbed on his penis with her vagina "like Brittany's boyfriend," coupled with the fact that child was known to mimic older children and had been given relatively free run of Salvation Army facilities while his mother worked, suggest that child may have been exposed to sexual activity before the alleged incident with youth (a possibility that was not explored by mother or Melum and Rosebraugh during the DHS interview). Furthermore, the evidence is undisputed that child had on at least one occasion exhibited sexual curiosity before the alleged incident, "exploring" with a four-year-old girl at a Salvation Army youth retreat. And, according to both youth and Maki, child tried to kiss other children at the Salvation Army, including climbing on top of youth while she was lying down and trying to kiss her on the lips.

In our *de novo* review of the record in juvenile delinquency proceedings, we usually give considerable weight to the juvenile court's assessments of witness credibility. *State ex rel Juv. Dept. v. Smith*, 185 Or App 197, 227, 58 P3d 823 (2002), *rev den*, 335 Or 402 (2003); *State ex rel Juv. Dept. v. Pfaff*, 164 Or App 470, 486, 994 P2d 147 (1999), *rev den*, 331 Or 193 (2000). The degree of deference that we grant to the trial court's credibility findings varies, however, depending on "the importance of the trial court's opportunity to observe the witnesses and our ability to discern the trial court's specific credibility determination." *State ex rel Juv. Dept. v. G.P.*, 131 Or App 313, 319, 884 P2d 885 (1994) (internal quotation omitted). For credibility determinations that are not based on a witness's demeanor, we are "as well equipped as the trial court to make [such] credibility determination[s]." *Id.*

In this particular case, in some respects, we have the same vantage point as did the juvenile court in evaluating credibility. Certainly that is so with regard to child, who did not testify in person at the hearing—his testimony came in second-hand via his mother and also via the videotaped DHS

interview. To be sure, only the juvenile court had the opportunity to assess youth's demeanor on the witness stand. But in that regard, we are inclined to assign less weight than the dissent does to the juvenile court's implicit discrediting of youth's testimony. Youth's testimony was limited both in duration and in scope. The dissent relies on that fact to assume that demeanor played a particular role in the juvenile court's assessment of youth's credibility. 191 Or App at 490-91 (Deits, C. J., dissenting). The dissent may be correct on that point. But the fact remains that youth's testimony was brief. By way of substance, youth answered questions directly and consistently. There was nothing evasive or internally inconsistent about the substance of what she said. Although we assume—as does the dissent—that youth's demeanor led the juvenile court to disbelieve her testimony, it is difficult to determine how heavily to weigh the juvenile court's assessment because we do not know how or in what way youth's demeanor detracted from the substance of her testimony.

■        As a result, on balance, the juvenile court's determination that it was "convinced [youth] did what [she was] charged with doing" does not erase our doubts about the adequacy of the evidence in this case and about the accuracy of child's reporting in particular. Those lingering doubts weigh particularly heavily in this case. Child's hearsay statements provide the state's only affirmative evidence of alleged sexual abuse; without them, the state does not have a case. The standard of proof that we must apply—proof beyond a reasonable doubt—is a high one and requires us to be satisfied "that the facts asserted are almost certainly true." *State v. Dameron*, 316 Or 448, 458, 853 P2d 1285 (1993). On our *de novo* review of this record, we do not have that level of confidence in the truth of the allegations against youth. Rather, the inconsistencies in child's accounts of the alleged abuse, the instances of embellishment during the DHS interview, and the suggestion in the record that he may have been exposed to sexual activity before the alleged incident leave us with an "honest uncertainty" as to whether youth committed the acts as alleged. *See State v. Pratt*, 316 Or 561, 576-77, 853 P2d 827, *cert den*, 510 US 969 (1993) (approving instruction

that included statement that "reasonable doubt means an honest uncertainty" as to the facts alleged).

Reversed.

**DEITS, C. J.,** dissenting.

The majority holds that the evidence in this record is not sufficient to support the trial court's determination that youth was within the jurisdiction of the juvenile court. For the reasons that I will discuss, I disagree with that holding and would affirm the trial court.

Although the majority discusses some of the evidentiary issues raised by youth, it does not directly address the evidentiary questions that she raised because it concludes that, even if the disputed evidence is considered, the state has failed to prove beyond a reasonable doubt that youth committed acts that would constitute first-degree sexual abuse, ORS 163.427(1)(a), and first-degree sodomy, ORS 163.405(1)(b). It is necessary for me to address the evidentiary questions, however, because I believe that, if the disputed evidence, namely the videotaped interview of child, and his mother's (McNamara's) testimony about statements that child made to her, is considered, I would conclude beyond a reasonable doubt that youth committed the alleged acts.

Youth argues that the trial court erred in admitting McNamara's testimony about the statements that child made to her and the videotape of the interview of child by a state police officer and a DHS worker. The trial court admitted that evidence under OEC 803(18a)(b), the exception to the hearsay rule for statements made by children concerning sexual abuse. Youth contends that the evidence was inadmissible because the statements were unreliable and because the state did not provide sufficient corroboration of the act of abuse as required by OEC 803(18a)(b).

OEC 803(18a)(b) provides, in pertinent part:

"A statement made by a person concerning an act of abuse * * * is not excluded by ORS 40.455 if the declarant * * * is unavailable as a witness but was chronologically or mentally under 12 years of age when the statement was

made * * *. However, if a declarant is unavailable, the statement may be admitted in evidence only if the proponent establishes that the time, content and circumstances of the statement provide indicia of reliability, and *in a criminal trial* that there is corroborative evidence of the act of abuse and of the alleged perpetrator's opportunity to participate in the conduct and that the statement possesses indicia of reliability as is constitutionally required to be admitted. * * * If the declarant is found to be unavailable, the court shall then determine the admissibility of the evidence. * * * In determining whether a statement possesses indicia of reliability under this paragraph, the court may consider, but is not limited to, the following factors:

"(A)   The personal knowledge of the declarant of the event;

"(B)   The age and maturity of the declarant or extent of disability if the declarant is a person with developmental disabilities;

"(C)   Certainty that the statement was made, including the credibility of the person testifying about the statement and any motive the person may have to falsify or distort the statement;

"(D)   Any apparent motive the declarant may have to falsify or distort the event, including bias, corruption or coercion;

"(E)   The timing of the statement of the declarant;

"(F)   Whether more than one person heard the statement;

"(G)   Whether the declarant was suffering pain or distress when making the statement;

"(H)   Whether the declarant's young age or disability makes it unlikely that the declarant fabricated a statement that represents a graphic, detailed account beyond the knowledge and experience of the declarant;

"(I)   Whether the statement has internal consistency or coherence and uses terminology appropriate to the declarant's age or to the extent of the declarant's disability if the declarant is a person with developmental disabilities;

"(J)   Whether the statement is spontaneous or directly responsive to questions; and

"(K)   Whether the statement was elicited by leading questions."

(Emphasis added.)

Youth does not dispute that child was unavailable. Further, I agree with the majority's suggestion that, under the text of OEC 803(18a)(b), the corroboration requirement of the rule is not applicable in a juvenile proceeding. 191 Or App at 480-81 n 2. Consequently, the critical evidentiary issue here is whether the state established that the time, content, and circumstances of child's statements provide sufficient indicia of reliability.

The trial court made express findings on the factors listed in OEC 803(18a)(b)(A) to (K). The court found as follows:

- Factor A:   The out-of-court statements made by child were based on his own personal knowledge.

- Factors B and H:   Child's youth makes him more credible and less likely to manufacture a story of this nature, one with graphic detail that is beyond the knowledge, experience, and imagination of a four-year-old.

- Factor C:   There is certainty that the statements were actually made, because they were videotaped and because McNamara is a credible witness.

- Factor D:   There is no apparent motive that child would have to falsify or distort the event.

- Factors E, J, and K:   The statements child made to his mother were spontaneous and not provoked by questioning; the videotaped statements were responsive to questioning but not elicited by leading questions.

- Factor F:   There were three people who heard the statements (on two different occasions), and the statements are videotaped.

- Factor I:   Child's statements have internal consistency and coherence. As support for that finding, the

trial court noted that child corrected the interviewers several times regarding the order of events.

Youth disputes the above findings of the trial court on two grounds. First, she asserts that the trial court should have placed more emphasis on child's "motive to falsify." According to youth, McNamara stopped using child's previous babysitter because child was unhappy with her and so the trial court similarly should have concluded that child fabricated a story about youth touching him so that she would not babysit him any more. Youth's argument on this point is highly speculative. There is evidence in the record that child's previous babysitter did not play with him as much as youth did. Child also stated that the previous babysitter was "very, very bad." However, there is no evidence that McNamara considered the opinion of her four-year-old son in deciding to find another babysitter. Instead, McNamara explained that she began using youth instead of the former babysitter after several occasions when the babysitter was not there when McNamara went to pick her up. Moreover, child could have picked up from his mother the idea that the previous babysitter was "bad" when it became clear that she was frustrated with the babysitter's unreliability; there is no indication in the record that child believed that babysitter was "bad" before McNamara decided not to use her any more. Finally, the only indications in the record that child disliked youth or her behavior came in the context of child discussing the touching and youth's telling him not to tell anyone: there is no indication that child generally disliked youth or wanted her not to babysit him. Accordingly, I would conclude that the trial court correctly gave little weight to the possibility of any motive to falsify in assessing the reliability of the hearsay statements.

Youth also argues that the trial court erred in its consideration of the reliability of the challenged evidence because, in youth's view, child's testimony lacked "internal consistency and coherence." On *de novo* review, considering all of the statements that child made to McNamara and his grandmother, as well as to the persons who interviewed him in the videotape, I agree with the trial court's assessment that child's statements were reasonably consistent.

To support her assertion that child made inconsistent statements, youth contends that there were inconsistencies in child's reporting of the type of touching that occurred and that he recanted some of his allegations. Child did describe numerous types of touching that happened to him. However, the fact that he eventually revealed that youth touched him in three different ways does not necessarily make child's statements inconsistent. In fact, they were not. None of child's later statements *contradicted* earlier statements that he had made. Although he gradually revealed that the three types of touching occurred, he never said anything like, "No, she didn't kiss my penis, she touched me with her hand." Rather, he kept adding details to his account of what happened. Significantly, none of the details that he revealed were directly contradicted by any other detail.

Youth also asserts that there were inconsistencies in child's statements about whether his pajamas were zipped when youth allegedly touched him. Again, a close look at the evidence reveals that there is no inconsistency in child's testimony. Child said that he had his pajamas on and that they were zipped and that youth "zipped them." He then said that youth "opened them." Youth could well have helped child get into his pajamas and then later opened them as child alleged.

The inconsistencies that youth points to in child's statements are minor at best. Particularly considering his young age, child's testimony was, in fact, remarkably coherent and consistent. As discussed above, although he reported more details to his interviewers, none of the statements that he made to McNamara, his grandmother, or the interviewers was contradictory. Child was completely consistent about the time and circumstances that he related: in his pajamas, on the couch in his living room, on a certain date, and all in one incident. He, in fact, corrected the interviewers when they suggested other variations of what happened. For example, when the interviewers suggested that something might have occurred in the big bed at his house, he replied that nothing happened there: child repeatedly said that it happened on the couch. Considering all of the factors relating to reliability identified in OEC 803(18a)(b), I agree with the trial court that there were sufficient indicia of reliability to justify the admission of the hearsay evidence.

I would hold that the trial court properly admitted the hearsay evidence. I would also hold that, on *de novo* review, ORS 419A.200(6)(b), the evidence proves beyond a reasonable doubt that youth committed acts that, if she were an adult, would constitute the crimes of first-degree sexual abuse and first-degree sodomy and, consequently, that the record is sufficient to support the jurisdiction of the juvenile court.

This is a case that turns on the credibility of the witnesses, in particular, child and youth. Obviously, one of them is telling the truth and one is not. The trial court found that child was telling the truth and that youth was not. As a general matter, although our review is *de novo* in this type of case, we give significant weight to the trial judge's determination of credibility, particularly when the credibility determination is based on the witnesses's demeanor. *In re Schenck*, 318 Or 402, 420, 870 P2d 185, *cert den*, 513 US 871 (1994); *State ex rel Juv. Dept. v. Smith*, 185 Or App 197, 222, 58 P3d 823 (2002), *rev den*, 335 Or 402 (2003); *State ex rel Juv. Dept. v. G. P.*, 131 Or App 313, 319, 884 P2d 885 (1994).

The majority concludes that we owe little deference to the trial court's determination of child's credibility because we have the same ability to view the videotape as did the trial court. I agree that, under these circumstances, we owe less deference to the trial court's credibility findings with respect to child. Further, although our evaluation of child's credibility depends in part on our observations of his demeanor, it also depends on our own assessment of the internal consistency, logic, and corroboration of child's statements. In such circumstances, the majority is right that we owe less deference to the trial court's credibility determination. *In re Schenck*, 318 Or at 420-21.

Although I agree with the majority that we can assess child's credibility without giving significant weight to the trial court's credibility findings, my assessment of child's credibility differs from that of the majority. As I discussed above, I found child's statements to be remarkably consistent, detailed, and believable. The majority identifies three factors that it believes create reasonable doubt in this case. First, it asserts that child's reports to his mother and to the

investigators differed substantially. I disagree. As discussed with respect to the reliability of child's statements, child did eventually add more details to his account of what happened, but the added details did not contradict or undermine his earlier statements about what had happened. He never changed his story or denied that something that he had described earlier happened. For example, child initially told McNamara and his grandmother that youth had kissed his penis. Although he revealed to the interviewers that youth had touched him in other ways, he continued to tell them that youth had also kissed his penis.

The majority also discounts child's credibility because, in its view, child embellished his story for the interviewers. Specifically, the majority notes that child said that youth had rubbed on his penis "again, again, again, again, again and again" and says that youth kissed his penis "more and more and more." I do not view the those comments by child as embellishment. Rather, this sort of talking, in my view, reflects a four-year-old's childish way of describing what was a traumatic event. Moreover, child produced the repetitive responses only at the end of a 30-minute interview—a long span of time for a four-year-old—when it seemed as if child were growing tired. I believe that the majority attributes too much significance to the use of language in this way by child.

Finally, the majority suggests that child may have been exposed to other sexual activity at the Salvation Army, thereby lessening the credibility of his statements. However, other than a single comment that child made to the interviewers that youth rubbed on his penis with her vagina "like Brittany's boyfriend," there is simply no evidence that child was exposed to any sexual behavior at the Salvation Army or that, in fact, any sexual activity occurred at the Salvation Army. Such an assertion is quite speculative.

For the reasons discussed above, I find child's testimony to be believable. That, however, is only half of the picture. The other half of the picture is youth's testimony. We cannot evaluate child's testimony in a vacuum. In deciding who is telling the truth in this case, we must also assess the

credibility of the other critical witness—youth—and, consequently, the *relative* credibility of both witnesses. The trial court implicitly found youth not to be credible by accepting child's version of events and not youth's: "[I]t's a decision that I would like to avoid. But, [youth], I'm convinced you did what you're charged with doing."

In my opinion, we owe considerable deference to the trial court's conclusion regarding youth's credibility. Only the trial court had the opportunity to observe youth, unlike child, and to directly assess youth's credibility as a witness. Further, because of the fairly limited and straightforward nature of youth's testimony, the assessment of youth's credibility is more dependent on the court's observations concerning demeanor rather than factors such as internal consistency that we could assess as well as the trial court. The majority offers no real explanation for why it essentially completely disregards the trial court's assessment of youth's truthfulness, nor does the majority explain how it assessed youth's credibility relative to child's credibility in deciding who was telling the truth.

For all of the above reasons, I believe that the evidence shows beyond a reasonable doubt that youth committed the alleged acts and is within the jurisdiction of the juvenile court. Accordingly, I would affirm the trial court, and I respectfully dissent.